May it please the Court, I'm John Stevens, I'm here with my partner Kim Buckley and Mike Esler, and we represent Karen Benson, E.J. Bricks, LLC, AFCTS, California, the Virginia Med Trust, and Victoria Med, who are collectively or have been collectively known in this case as the American Funeral Plaintiffs. This case presents the overarching issue whether a contract entered into with a receiver during the pendency of a receivership is going to be enforced as written. And there are two ways to approach this case. One is from the perspective of the American Funeral Plaintiffs Agreement that the American Funeral Plaintiffs entered into with the receiver on March 1st of 2002 and that was approved by the District Court in June of 2002. And then the other is to approach it from the perspective of the Second Amended Distribution Plan that was approved by the Court approximately a year later. Either way the Court approaches the case, the result is the same. Let me ask you one preliminary question before we sort of get to the heart of your argument. There are two appeals here. Correct. Correct? One involves Benson and Bricks, I believe it is. That's appeal number 0435539. Do we have appellate jurisdiction over that appeal? I believe that you do, Your Honor, for several reasons. Let me ask you one preliminary question, though, and as you frame your answer you can add this into it as well. After these two orders were entered relating to Benson and Bricks' tracing dispute, did they have any claims remaining against the receiver? They were at that point entitled to receive a distribution from the receiver. So that distribution claim was still, in other words, is there still anything left for Benson and Bricks in the receivership? There was money in the receivership, but there wasn't anything left to be decided with respect to what it is that they were to receive. Automatically they would get it? It was automatic that they would get it, and the basis for determining the amount of the distribution to them was determined. Was there already a concrete formula in place? There was a formula in place that the receiver had, whereby the receiver determined what the proceeds were of the specific investments that had been made by the clients who were entitled to and were able to elect the tracing option. And so there was a formula in place with respect to those people and what the amount of the distribution was. I only raise this because there was no 54B order here with respect to Benson and Bricks. Correct. Right. And the primary issue, or really the only issue, with respect to them was, one, whether or not they were going to be entitled to trace, which the district court agreed that they were entitled to that. And then the second issue, which was, what is the amount of the consequence of having to pay to the receiver or have a reduction in the amount that they were receiving as a consequence of their share of the $9.975 million? This may all be academic because there was a final order, separate order, under 54B under this to the other appeal. Yeah, there are two things. One is this is a practical matter. If there is a Rule 54B judgment with respect to the other three plaintiffs, and I don't think there's any question about this court's appellate jurisdiction with respect to that. If there were a non-final decision with respect to the other two, presumably that appeal would be dismissed. The court would have the benefit of this court's decision with respect to the other three and could make a decision that conformed to whatever this court's decision was. I don't want to take any more time from your mirror. I might add that one thing that I should have added, and I did, with respect to that issue, were our two decisions, and it has to do with the collateral order doctrine, the Supreme Court announcement of the Cohen case in 1947. And I'll bring them to the court's attention. One is SEC v. Why don't you just add your argument, and you can give the clerk that. Perfect. Fill out a piece of paper. Okay. And because I think that that finally resolves the question of jurisdiction with respect to the other two. Focusing first on the American Funeral Plaintiff Agreement and approaching this case from that perspective. In that agreement, the American Funeral Plaintiffs assigned all of their claims against most of the defendants, or virtually all of their claims against most of the defendants, to the other plaintiffs' groups known collectively as the remaining plaintiffs. The second thing that they did in that agreement is they also assigned any right that they had to any proceeds of any settlements with those settling defendants and other defendants. Again, they assigned that to the remaining plaintiffs. It seems to me there was a release language, too. They also released any claims to those if there was any. They did as well. They gave up all of their rights as against the settling defendants, and they assigned those rights to the other plaintiffs. The claims were not released in the sense of destroyed because, obviously, the purpose of the assignment was to give the other plaintiffs the benefit of those claims against the settling defendants and the other defendants that were. As I understand it, without going beyond the strict interpretation of in contract law in Oregon and not getting into anything with regard to something that would require collateral evidence, it seems to be agreed that the strength of your client's position relative to these claims was different from the other which led to this because you would not participate in the global settlement. And apparently, your strength was such that they were willing to pay $10 million to get rid of you because you were mucking up the settlement and they couldn't go forward. I mean, I think everybody agrees the fact that you were able to negotiate $10 million because you had very strong, clean claims where the other fiduciary type investors might not have been so clean. There's two aspects of that. One is our intention wasn't to muck up any settlements. Oh, come on. I mean, we've all been there. I mean, whether you mucked it up or not, they weren't going to go forward until you agreed and you weren't agreeing with their approach. So you had to bring Judge Levy in who can hammer anybody, and you didn't hammer anybody. So you had to do something. And so the only way to get rid of you, they were going to buy you out and they bought you out. They did buy us out. And I might add, though, the other aspect of the strength of our claims was that they now have the benefit of our strong claims. Absolutely. That's my point entirely. But nowhere in any documentation does it describe what the $10 million is, goodwill, strength of position, you name it. You were bought out, period. $10 million, get lost. In the agreement, it is a specified $9.975 million. Exactly. And it wasn't labeled settlement proceeds. And in the final document, which was the plan, settlement proceeds do not have any description of what might have happened in this document. That is correct. And, in fact, the Second Amendment distribution plan doesn't refer to our agreement. It's clear from the context that our agreement has to be taken into account. Well, that's interpretation. I'm talking about strict language. Furthermore, the final settlement with the settling defendants, as I read it, was something like $109-something million. Correct. And we don't know how much your claims contributed to that. They may only have gotten $50 million, for all we know, without your claims. We don't know any of that. Isn't that correct? That is correct. So the $10 million is just consideration to get rid of you. It is consideration to buy our claims. That's right. Get you out of the picture. Against the third-party defendants. Yeah, against the third-party defendants. Exactly. And that's the best you can see without inferences or without something else specific. Correct. Our claims have been purchased. Our right to settlement proceeds have been purchased. And we have reserved specific claims that relate to our investments that capital consultants had. But the key was, in the language that I seized upon, this was also a release of all claims against the defendants. You didn't reserve anything more so that you were out of the picture. The key was, if you had to reserve something else against the settling defendants, then maybe there's something residual. You got out of the picture. We were out of the picture with respect to the settling defendants and the other prospective defendants. And reserved your claims that were on Exhibit A. Yes, and there are certain groups of defendants in the agreement that we do reserve claims or that our reserved claims potentially apply to defendants. But it's not relevant to the settling proceeds which are involved in the plan. I believe that, as a practical matter, the settlement proceeds came from the settling defendants and the other prospective defendants, and there may be some amounts that came from some of the others. So there's another accounting thing that would remain later, maybe, even if you had to disgorge. There's another accounting possibility in what you do with those settlement proceeds? That if you reserve some claims against pure reservation in your document against some of those settlement proceeds because of other defendants or maybe? No, because all of the claims that we reserve as to the other three groups of defendants are all part of the reserved claims. What was described as being defendants, potential defendants, was so broad that it potentially encompassed entities that owed money to us on our specific investments. And so our reservation of claims with respect to those three groups of defendants relates specifically to our reserved claims. Are those subject to the tracing procedure or subject to sharing in what was called the settlement proceeds in the plan? Those would not be settlement proceeds because they aren't amounts that came in from the defendants in the related party litigation. Okay, and that's my point. So as far as the settlement proceeds, you released all claims against what is described as settlement proceeds in the plan, and you assigned whatever rights you may or may not have, whatever those rights were, to the settling plaintiffs to get out the 10 million. We did assign them the claims that we had against settling defendants and the other potential defendants and did receive the 9.975 million for that. I also note in the language of Exhibit 1 that even though you made those reserved claims, the other parties did not admit. In effect, they said, fine, you've got reserved claims. We're not going to agree that there's specific claims. They do. There is some specific language. So it was anticipated that you would have something further relative to when you start asserting those other claims. It was anticipated that the parties would be free when it came to arguing about the distribution plan, that each side could make arguments about that. Exactly, and nowhere in that assignment document does the word tracing appear anywhere. The word tracing does not, but it is clear that we are reserving our right to our investments. No, no, I understand. That's very clear, but tracing becomes a word of art relative to this lawsuit and this appeal, and nowhere in the assignment agreement does tracing come in. The only time it comes in is when the plan is formulated. That's the first time tracing pops up. That's the first time the word pops up, but the whole purpose of tracing in the Second Amendment distribution plan is the right to trace to the proceeds of the specific investments. That's the word that's used. Now, you said you reserved your right as to investments and income therefrom, and you're saying that, in turn, generically describes tracing. It does. It's substantively exactly the same thing, that it's the proceeds from our investments, it's the income from our investments, and it's the investments themselves. So that would be in deference to a concept of pro rata sharing. It would relate. Well, it wouldn't relate to pro. It would be in contrast to pro rata sharing. Because you could have pro rata sharing and still go after it and say I'm entitled to whatever my investments were, which is the flip side or the remaining side of what was in the plan, other than the settlement proceeds. If we go the pro rata route, we don't, under the Second Amendment distribution plan, if we didn't have a right to specifically trace our investments, our client-specific investments. I understand, but you still got a pro rata share of your investments, the income therefrom, and, in fact, the pro rata share of everybody when you get right down to it. Correct. But not settlement proceeds. Exactly. Would you explain one issue to me? That is in paragraph one of the agreement. It provides that the $9.97 million is to be paid from immediately or within a very short period of time regardless of the source of such funds. Right. That seemed to be a big concern to the receiver. Which suggested that he needed to have that money replenished. I think the purpose of that provision was it was more from our direction that the $9.975 million was going to come from any source, meaning if the settlement money went into the receivership estate and it were available, and I'm saying the settlement money, the settling defendants and the remaining plaintiffs. That happened later, didn't it? It did. And if that money had been available, then that would have come to us. If it's the money that Goldman Sachs had paid to purchase actually our investments and that money was available, then it would come from that. Or if it's the servicing income that the receiver had collected from the various parties, again on our investments, the $50 million, if that money were available, the participating plaintiff's share of that money was available, then that money would be paid to us as well. Essentially what it was is that the American funeral plaintiffs wanted to receive their $9.975 million at the earliest possible time. And the source of it was irrelevant. Let me say, is it unambiguous that the term settlement proceeds is used in these various paragraphs in the agreement? It was meant to refer only to the settlement proceeds from the settlements against the third party defendants. The term settlement proceeds is used in the second amended distribution plan. My question was with respect to the agreement. With respect to the agreement, the primary language that would be relevant there would be in paragraph 3D. 3B? 3B. It's at page 71 of the excerpt. 3B as in boy or 3D as in dog? No, 3B as in dog. Dog, okay. And there the American funeral plaintiffs assign to the remaining plaintiffs all of their right, meaning the American funeral plaintiffs' right, to the proceeds of any settlement with or recovery from the settling defendants. And then there's the other dependents on the American funeral plaintiffs' claims. I'm skipping down to the fourth line. And that's where it is that we give up all of our right to receive those proceeds. Okay. Do you want to save? I think you may have about a minute left. I'd like to save some time. Thank you. Maybe a minute and a half. I don't know. Good morning, Your Honors. Lorraine Petowitz on behalf of Tom Lennon, the receiver. Your Honors, I would first like to address a couple of factual issues. It is not by any means conceded and agreed that this group of plaintiffs had the strongest claims. What difference does it make? You paid them $10 million. That's the whole point of settlements and general releases. Nobody knows what it's all about unless it's in the document. And here, if you're saying that the record, and for purposes of extrinsic evidence, I guess, are you saying the record's in dispute that they had strong claims or not had strong claims? I'm saying that the reason it's making the point is because the receiver and the remaining plaintiffs weren't paying to buy the claims in order to assert the claims. They were paying in order to be able to release the claims and move forward on the settlement that at that time had already been reached. You're bringing in extrinsic evidence.  You got everything they had relating to these settlement defendants. You got everything. Excuse me, I'm sorry. Go ahead. If the document is not clear, then by definition we need to look at extrinsic evidence. But I think that there is the evidence. No, I'm saying where's the ambiguity to look at the extrinsic evidence? Well, Your Honor, within the agreement is the information to conclude that it was a payment in order to obtain a release to move forward with the settlement. And that is in the conditions to this American Funeral Plaintiff Agreement. Where is that? It is in 3A, Your Honor. 3A? The American Funeral Plaintiff Agreement was conditioned on three things. One, approval out of two out of the three settlements that were then agreed to in principle. And those were the major settlements. Those were the key players, Lane Powell, which served as counsel to capital consultants, Stoll Reeves, which served as counsel to the Wilshire Group, and the Wilshire Group defendants, which was the major part of the Ponzi scheme. Well, if you look at this document, it's called an assignment, I believe. I'm not sure. It's called a settlement agreement. It's a settlement agreement. And in some instances it's called an assignment. But it really is a general release. And then they assigned the claims. You could add a general release. Then you'd add some sort of an ambiguity as to if their claims could be asserted against the other parties. But you took the whole ball of wax. You, I'm meaning the settlement defendants. You not only got a general release, you also got an assignment of all claims. So there was nothing left in these folks. They're gone as far as the settlement defendants, I guess you'd call them. Right. That's correct, Your Honor. But I don't think of it as a general release. I think because of the recitals that are contained. It was a general release. They released all claims they had. It was a general release. They did. Except for the reserve amount. Which you can't ignore. I mean, and case law says you don't ignore the recitals. You don't ignore the other provisions in the agreement. The other provisions in the agreement is there was never going to be a dime paid to the American plaintiffs funeral group unless two out of the three settling defendants' settlements were approved and funded. And that $10 million could have been just for that. Because we don't know this, but in the negotiations and the mediation, the removal of these folks were a pain in your butt. Could have been worth $10 million. We don't know that. And it could have been worth $50 million in the settlement amount. We don't know that. That's why general releases and settlement agreements are made. Nobody has to say why they're doing it. They just do it. And there's nothing in the recitation that puts any qualitative amount on what it was to get rid of these folks. In other words, let's suppose, just for instance, and this is way beyond it, and this is what troubles me. Let's suppose that before getting rid of these defendants, you probably could have bargained up to $50 million. And let's suppose that by getting these people out without quantifying any values, you could get $109 million. Guess what? $10 million is a good deal. And so we don't know all of that. I mean, anybody that's ever been in a negotiation settlement knows that these things are all very nebulous, and that's why you make settlements and general releases. You get rid of it. And the only point of all this is I've never been able to look at any document to determine what the $10 million is, and yet in the plan they're forced to disclose it even though there's no designation. It could have been blood money. It could have been just good old goodwill. It could have been leveraging. Who knows what it was? But it's been identified by the judge in interpreting two documents, without tying the two documents together in any way with regard to definition of settlement proceeds, that these are settlement proceeds that they have in their hands. Your Honor, I respectfully disagree with your conclusions. I understand your argument. That's not a conclusion. That's not a conclusion. It's a dilemma that I have. Okay. This document is not just a two-party settlement agreement and release of a claim in a lawsuit. This document is an interplaintive agreement that is part of a massive global litigation that was referred to mediation. There were, I think, I don't know, over a dozen lawsuits pending at the time Capitol Consultant's receivership was initiated. There were more filed after it was initiated. Judge King made the reasonable decision that in his administration of the receivership that we've got to corral these lawsuits. We've got to send them to Judge Levy, of course, and we've got to get settlements before all of the defendants' insurance proceeds are eaten up. That's all conceded. It still doesn't alleviate the fact that somehow you interpret the $10 million that they received on this agreement as settlement proceeds on a later-developed plan. Your Honor, they were settlement proceeds at the time. The parties have agreed. So in that context, I think it is agreed. But there were still no proceeds from any potential settlement they would recover against the third-party defendants. I'm sorry. I didn't understand. Well, this term, as I asked in my last series of questions to counsel, the term settlement proceeds within the plan, I'm sorry, within the agreement, that referred to settlement proceeds that might potentially come later against the third-party defendants. Better yet, those third-party defendants' settlement proceeds had already been determined after these folks were out. When you did the plan, it was cut and dried and done. You'd already got the money from the settling defendants. And nowhere in the two documents does it describe what this $10 million is, other than the fact you got rid of these folks. Your Honor, again, I believe that because the context of this is under the umbrella of an administration of a receivership and the settlement was approved in the context of all these other settlements approved, and in that context, all of the lawyers referred and agreed that this was this group of plaintiffs' accelerated and enhanced share of settlement proceeds. From what might be recovered from the third-party defendants, not from any other part of their proceeds? No, from what had already been recovered from the settling defendants. I'm not sure when you say third-party defendants. I mean, these were the defendants that CCL and all the CCL investors had claimed to be. You can correct me if I'm wrong, but I understood that these plaintiffs had their own – they could have mounted their own lawsuits. In fact, they did, against some of these settling defendants. Correct. Separate lawsuits. They could have just gone ahead and litigated them.  They could have opted out of the mediation and litigated. Right. But those defendants – there were other numerous plaintiffs and numerous defendants. Right. And there's another group of plaintiffs that want – and the defendants wanted to settle. And apparently – and I don't know whether their claims are more meritorious or not so meritorious, but apparently they were able to position themselves to essentially sell their claims against these other – against these settling defendants to the other co-plaintiffs. That's what – that's what I see happening here. They assigned their claims because that was – For money. For money. For the purpose of those plaintiffs being able to release them and accept the settlements that would ultimately fund the payment. That may be extraneous. What is known, there was no – nothing recited in the settlement agreement as to what was on the table, i.e. settling defendants will give us $1.9 million. They did not take $10 million of the $1.9 million. It was not disclosed. And, in fact, you couldn't come to a settlement because they disputed from what – they disputed the methodology and the way you were settling with the defendants. So all you did is get them out of the picture. The best that I can tell from this agreement is you go away, we'll give you $10 million, we can proceed against the defendants and we'll get our money. But you go away for $10 million. You go away and we'll give you what you think your share of the settlement pot will be. That's not what it says. Now and out of the settlement in advance. That's not what it says. It says you go away for $10 million. Nowhere does it say – nowhere do they agree that their share of the settlement proceeds is $10 million. Can you show me where it is? That we would have to look to extrinsic evidence. But I think you need to look to extrinsic evidence when you have an agreement reached in this kind of a context under a receivership where the recitals indicate that the settlement – that the payment that's to be made will ultimately be made from settlement proceeds. Your Honor, if I might just also address the specific appellants that we're talking about. The American Funeral, they have conveniently in their brief defined American Funeral Plaintiffs as these appellants. Well, American Funeral Plaintiffs was a group, a larger group. Some of which had probably stronger claims, some of which didn't. At the end of the day, of course, as in the prior appeal, most of the legal positions people have taken have been taken to maximize the distribution to a particular individual client, which is certainly the case here. The reason these particular appealing parties are here is because they are electing to trace because under – three out of the five would receive no distribution under a pro rata share because they had no damages. Where does tracing appear in the settlement document? It doesn't. No, it doesn't. They reserve their rights to the – to proceeds from the – and always in this case there's been sort of the receivership pot, which are the assets. That's over here. And the settlement pot. And they reserve all their rights to the receivership pot, subject to whatever distribution plan the court adopted. The court adopted a distribution plan that made distributions based on a net NEMO claim and made them pro rata. And there was a very specific limited exception for people to trace their investment. And as is supported by the case law and is logical, anybody that's going to trace their investment, they're saying, hey, I'm monitoring my investment. I'm happy to just take the proceeds of that investment, which in this case for these investors – No decision was made to do that. The decision, though, to couple that with not be able to share in the settlement proceeds is the next step. And that wasn't objected to, and that's not an issue either. The problem is how do you base your jurisdiction on the $10 million? That's the interpretive process. How can you get jurisdiction over the money they got paid for an unknown claim that was undetermined and for unknown reasons given $10 million? The same way that the court took jurisdiction in the prior appeal over the third-party recoveries, because the claim as it's defined going into the distribution plan and taking those proceeds has to be appropriate and has to be set off by amounts that they've already received. That's sort of an edict that has to be done. You're ignoring what do we do with the Oregon law in construing contracts? I mean, how can you go outside of the – these two contracts exist in parallel because they didn't tie together tracing. If it wasn't for tracing, we wouldn't be here. Nobody tied tracing together. Nobody put the $10 million into the definition of the settlement proceeds in the plan. And so now we have two documents. They're not in conflict. They just don't come out to the right answer for some folks. I think they do come out to the right answer, and Judge King made it. And the way you tie it together is that – Did he use his equitable powers and receivership to do that? And did he abuse his discretion in doing so? He did not abuse his discretion in doing so. How did he do it? He reasonably concluded that, as is – if you look to the extrinsic evidence, attorneys for – counsel for the appellants also admitted these were their negotiated share of settlement proceeds. It doesn't make sense for someone who can – That's not – but do you agree that that's not in the settlement document? That is not in the settlement document. I agree. But I do agree that there is enough in the settlement document, enough references to the fact that they're ultimately to be paid from settlement proceeds, that they will not be paid at all unless settlements are funded. And that would – and by the way, that was not a small amount. The settlements that had to be funded would have been at a minimum of $37 million, at a maximum of $67 million. As it turned out, by the time the American Funeral Agreement was approved, there was $109 million in settlements. Well, unfortunately, the judge didn't do any reasoned decision. He said, I just adopt your position, which was a fiat based upon the plan. So shouldn't we send it back then and figure out what that $10 million really was? In other words, if we're going to really go on – there's a chance to interpret these documents as having ambiguity into them, there's no reasoning in that opinion in which we can determine whether your proof is a suspicion or not, other than the fact to say you're right because it sounds right. Your Honor, with all due respect, by adopting our reasoning didn't mean that he didn't – didn't essentially run through the same reasoning, which is that all parties understood from the get-go that it wasn't a purchase of claims in order to assert them because they were stronger and more would be settled. It was removing a roadblock to settlements that had been offered and that were – that other parties believed they could get. It was post and at the time – at the time the motion was brought to approve the settlement agreement and they didn't object to the description in the motion, this is the enhanced and accelerated distribution to the American Funeral Plaintiffs. None of their clients – Those words enhanced distribution is not in the settlement agreement either. No, you're not. You're right, Your Honor. But none of their clients had to elect to trace. There would be no set-off of their settlement proceeds had they been happy to accept the pro-rata distribution under the plan. They chose a specific exception, which all logic in equity dictates. You don't also get to share in the settlement proceeds. Ms. Penwood, this is Judge Nelson. Can you hear me? Yes, I can, sir. I have a question. Does your position give any effect at all to the reserved claim language in the settlement agreement? Absolutely, Your Honor. They reserved – What effect do you give to the reserved claim language and can the funeral plaintiffs ever get anything from a reserved claim as contemplated in the agreement? Yes, Your Honor. They – what they reserved was their claims to the receiver side of the pool. And they reserved the right to be treated equally with all the other plaintiffs. And the other 45 or more American Funeral Plaintiffs have gotten exactly that. They reserved – Excuse me. They didn't reserve the right to be treated equally. In fact, they reserved the right not to be treated equally because they said, this agreement shall not reduce what we get or affect what we get on the other side. I respectfully disagree, Your Honor. They reserved – Are you disagreeing with the interpretation you might give to the – I'm not saying that's what it says, but there's two interpretations you're saying. I'm disagreeing with the interpretation. Well, it's not my – I'm just saying that they seem to have reserved themselves something separate in that. They reserved their right not to be – not for the receiver and the remaining plaintiffs not to propose a plan that went out after the premium they had asserted. And we didn't. Well, it says the proceeds – The plan is neutral to the American Funeral Plaintiffs. Well, what it says – They want special treatment under it. Excuse me. The language of the Exhibit A says in 11B, proceeds received upon the sale or other disposition of an investment is reduced or is a consequence of this agreement. That was something that they would not agree to. They reserved not to have it reduced. So I don't know what that means. Your Honor, I submit that that meant that they did not want a distribution plan adopted that would, as a group – and let's talk about the larger group, it's not just these five – that would discriminate against them for having entered into this and obtained the premium. People took some heat because, you know, why is this group getting all this money and getting it now? That wasn't what's on the plan. It was neutral to the plan. The plan simply provided, okay, we're going to do pro rata share of everything, and if you, somebody, think that you are so special that you've, you know, that you've monitored your investments and you want the trace dividends, great, but you don't have damages to go after. Let me ask you – I just have one last question for you. It kind of bothers me. You said a minute ago that there was the receiver's pot of money from the investments and liquidation and whatnot. And then there was the settlement funds from the third-party defendants. Did any of those claims that these plaintiffs might have had against the third-party defendants overlap with the money that was in the receiver's pot? No, I don't think so. They were entirely separate. Is that correct? Well, they were – the funds were kept separate. I'm talking about the rights. I'm not talking about the funds. I'm talking about the rights that were in dispute, the underlying contractual rights or court rights or whatever. The rights that they reserved were the rights they reserved against the receiver's pot. Pot. And then they had their other causes of action against these other third-party defendants that resulted in the settlement pot. Right. Right? That's correct, Your Honor. Okay. And I – do we have any more time? This is Judge Burnett. You're talking to Judge Nelson. I didn't mean to cut you off. Did you have something else you wanted to bring up? Well, I did have perhaps one further question. As you view the power of the receiver in the district court, and assuming – not asking you to agree, but assuming that the second amended distribution plan is not in conformance with the settlement agreement, making that assumption, where does the district court and the receiver get the authority to ignore the terms of the contract? I guess, Your Honor, the only way I can answer that is that we're not ignoring the terms of the contract. The contract was not entered into in a vacuum. Everyone viewed it as – So you're saying that the amended distribution plan is in compliance with the settlement agreement? Yes, Your Honor. I ask you to assume that it was not. Okay. Well, all right. Then, assuming that it's not in compliance with the settlement agreement, where do the court and the receiver get the authority to ignore the terms of the settlement agreement? Well, I don't know if I would say that they get – a district court sitting on an equitable receivership has the authority to administer claims and take into account other funds, those claims they've received from other sources, so that an equitable distribution results. This will be a windfall to these appellees. So you think it's a matter of discretion, just the fact that there's a receivership, is all that the court needs to ignore the terms of contracts that are involved in the receivership? Your Honor, I – no, I would not say that. I would say that the court had not ignored the terms of the settlement agreement, but had interpreted it consistently that they were settlement proceeds. Let's say the interpretation is incorrect. Then what? Then if the interpretation is incorrect, I think it's clearly not incorrect, particularly because I do believe you have the right to look to extrinsic evidence, and there's multiple evidence to look at. But then I would think that – I'm not sure that they wouldn't still have the right, though, to recognize that the district court, when it comes to distributing its assets, wouldn't still have the ability to recognize this premium that they have already received that reduces their damages. All right, thank you. Thank you. We have about two minutes. Okay, thank you, Your Honor. According to our best estimate here. Okay. Just a few points I'd like to make is, one is that in this instance, in the court's August 2003 order, it did not use its equitable powers. Rather, it was interpreting the agreement in the second amended distribution plan, and that's a matter of de novo review. Second, the court did not find that any of the provisions of either the second amended distribution plan or the agreement, the American Funeral Plaintiffs Agreement, was ambiguous, and therefore there's no occasion to look to any extrinsic evidence. In this case, the agreement is clear that the $10 million, or excuse me, 9.975 is coming from the participating plaintiffs. When one looks at the second amended distribution plan, it's also clear that that does not count to settlement proceeds, that those amounts have to be amounts that come from the defendants. And finally, it's also clear from the cases that we've cited in our brief that in the context of a receivership, the contracts entered into with the receiver by a participant in the receivership that are approved by the district court are to be enforced. Thank you. We appreciate your arguments, and the matter will be submitted.
judges: Brunetti, T.G. Nelson, Paez